Don K. BOWLES

v.

Olin E. ROBBINS, Individually and as Superintendent of Schools of the Lamoille North School District, and Lamoille Union High School District, et al.

Civ. A. No. 6309.

United States District Court, D. Vermont.

April 13, 1973.

Burgess & Kilmurry, Burlington, Vt., for plaintiff.

Adams & Meaker, Waterbury, Vt., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOLDEN, Chief Judge.

The plaintiff Don K. Bowles was engaged as a driver education instructor by the Lamoille Union High School District from September 1968 until the end of June 1971. When a contract for the ensuing school year was not approved, this action was instituted to obtain declaratory and injunctive relief, compensatory and punitive damages, attorney's fees and costs.

The parties defendants are Olin E. Robbins, the superintendent of the Lamoille North School District and the Lamoille Union High School, Carl R. Fortune, Jr., the principal of the Lamoille Union High School and the school directors of the Union District during the 1971 school year. All of the defendants are named individually and in their official capacities.

Plaintiff's claims are founded on alleged violations or rights protected by the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution. Federal jurisdiction is invoked under 42 U.S.C. § 1983. For the convenience of the parties, with the court's approval, the first stage of trial to the court was limited to the issue of liability, with hearing on the question of damages to await the determination of the defendants' liability.

The plaintiff taught for the school years 1967–1968, 1968–1969 and 1969–1970 under a "Provisional Contract for Teaching." His contracts for these years had this common provision:

All teachers entering service at the Lamoille Union High School shall serve a provisional period of two years. After completion of two years, the teacher becomes eligible for appointment to a continuing position. The teacher who is appointed to a continuing position shall have his contract automatically renewed so long as the professional and personal qualities of the teacher carry a rating of satis-

factory or higher. A teacher who holds a continuing contract shall be notified by January 1st if he is not to be rehired for the next school year. A teacher who holds a provisional contract shall be notified by March 1, 19— if he is not to be rehired for the next school year.

The contract under which the plaintiff taught for the school year 1970–1971 was entitled "Contract for Teaching" and differs from his three previous contracts in that it provides the school year shall begin August 31, 1970 and end on June 25, 1971. It does not contain language similar to paragraph 3 of the previous contracts, nor does it contain any language relating to dates of notification of non-reemployment. The contract provides, however, that:

> This contract shall not be valid unless said teacher holds a *Professional Standard Certificate* or *Professional Probationary Certificate* at the appropriate level as issued by the Vermont State Department of Education.

Although the plaintiff possessed Emergency Certificates for the 1967–1968, 1968–1969 and 1969–1970 school years and subsequently received a Professional Probationary Certificate for the 1971–1972 school year, he did not possess a valid teaching certificate for the 1970–1971 school year. The teacher has the sole responsibility to comply with the certification requirements. In March 1971 the plaintiff initiated procedure to procure certification and professional eligibility for a contract to teach in the 1971–1972 school year.

On February 18, 1971, Mr. Robbins wrote the plaintiff concerning the possibility that a contract might not be offered due to financing problems. (Pltf. 14). On March 30, 1971 the School Board instructed Superintendent Robbins to inform the plaintiff that "we must wait for bill (pending legislation) to pass in Montpelier before offering him his contract." On April 20, 1971 the School Board received notification of the availability of state funds in the amount of $7,850. The Board voted to offer the plaintiff a contract for twenty-eight weeks at a weekly amount to aggregate the amount funded by the State.

The following day a complication developed concerning a time shortage in the behind the wheel instruction of some students who had been certified by the plaintiff as having completed the six hours required by the Vermont statute.[1] The high school principal, defendant Fortune, questioned the plaintiff. During this conference the plaintiff admitted he had issued driving certificates to students who had not fully completed the six hour requirement. Prior to April 21, 1970 the principal signed the students' driver education certificates in blank and turned them over to the plaintiff with the understanding that they would be signed by him, as the instructor, and issued to the students upon the satisfactory completion of class and road time. As a result of this discovery, the final authority for issuance of the certificate was withdrawn from the plaintiff. Thereafter certificates were granted by the principal upon the plaintiff's signed certification of completion of the driver's training requirements. From time to time the principal Fortune questioned the students concerning their instruction time before he issued the certificates presented by the plaintiff.

On May 4, 1971 the Bowles contract for twenty-eight weeks was approved but not signed. The Clerk was authorized to sign the other teachers' contracts. On May 25, 1971 the Board dis-

1. 16 V.S.A. § 1045 provides:
 A driver education and training course, approved by the department of education and the department of motor vehicles and consisting of at least thirty hours of classroom instruction and at least six hours of behind the wheel instruction, shall be made available to pupils whose parent or guardian is a resident of Vermont and who have reached their fifteenth birthday and who are regularly enrolled in a public or private high school approved by the state board.

cussed Mr. Bowles' certification and the minutes of the meeting indicate that his contract would be issued when he received the certification by the department of education. On this date the state department of education notified Superintendent Robbins that the plaintiff's certification was under review. The letter went on to say "it would be fairest to Mr. Bowles to assume certification in the absence of negative evidence; but that any contracts or agreements entered into would be invalid if there are negative findings for certification by this office."

In the meantime, on May 17, 1971, the plaintiff received a statement published by the state department of education to all driver education instructors. The statement indicated a change in the driving time required for driver education students which had been agreed to by the commissioners of education and motor vehicles for 1971–1972.

The superintendent, Mr. Robbins, wrote to the principal of the Lamoille Union High School on May 27, informing him of this and requesting him to advise the plaintiff that no reduction in driving time would apply to the driver training program at Lamoille,—that no students would be certified unless they had completed the time required by the statute. (16 V.S.A. § 1046).

On May 27, the plaintiff, as driver education instructor, signed and certified that a student had successfully passed the course as required by the statute and sent the student to the principal for his signature to complete the certificate. The principal inquired of the student concerning his driving time, and sent the student back with a note informing the plaintiff that it appeared the student had received only a total of three hours of driving instruction.[1a]

Apparently without responding to the principal, the plaintiff took his troubles to the defendant Wilfred P. Marcoux, one of the school directors, in search of help. At that time he registered a complaint that he was being subjected to harassment and interference with his teaching duties by the administrative staff. Bowles informed Marcoux that if this course of conduct continued he would have to file suit to protect himself. At the conclusion of this conference Mr. Marcoux called the chairman of the school board to arrange a special meeting to consider these complaints and to make certain that no action was taken against the plaintiff because of his complaint.

On May 29 the School Board chairman questioned the superintendent concerning the plaintiff's complaint of harassment and asked for a report. The superintendent's efforts to confer with the plaintiff failed. On June 3 the superintendent prepared and submitted written questions to the plaintiff and the school principal which were addressed to the plaintiff's complaint of harassment, his manners and method of conducting the driver education program, the issuance of drivers' certificates and the plaintiff's teaching certification.[2] The principal answered the inquiries; the plaintiff declined.

On June 15, 1971 the School Board met and was informed by Mr. Marcoux of the nature of the Bowles allegations and that the plaintiff had threatened legal action. The superintendent submitted a written history of the certification and alleged harassment problems. The School Board then voted to withhold the contract until a further report was made. Following this meeting the superintendent sent two letters to Bowles regarding the hourly credit for student certification for the 1970–1971 school

---

1a. The note from the school principal to the plaintiff reads:
Mr. Bowles—
Marvin states he drove 10 times for 15 min. each time. I figure that to be less than 3 hours. Please let me know if my figures are incorrect.

2. Pltf's Exhibit 9.

year. The superintendent also called for a log of driving time and classroom training of all students who had completed the driver education program, and a list of students who had taken but had not completed the program. The plaintiff was notified that his final salary check for the 1970–1971 school year would be withheld "until these final duties and responsibilities have been completed." By another letter of the same day the plaintiff was requested to deliver to the principal, Mr. Fortune, a list of students who took driver training instruction on June 14, 1971. The letter stated that failure to comply with this order may subject the plaintiff to the possibility of suspension, as provided in the Vermont education law.[3]

The Court finds, on the strength of the plaintiff's testimony at the trial, that he had issued certificates to students who had not completed the statutory requirement of six hours behind the wheel instruction. The shortages, according to the plaintiff, varied from twenty minutes to two hours. The reason the plaintiff failed to respond to the written questions submitted by the superintendent was a fear that his certification of students, who had not completed the time required by the statute, might constitute an offense and his answers might incriminate him.

Without offering response to any of the inquiries directed to him concerning the driver education program, the plaintiff instituted the present action on June 18, 1971. Since the action was commenced, the defendants released and paid the plaintiff his final salary check for the 1970–1971 school year.

On July 1, 1971 an equivalency evaluation team recommended the plaintiff to the Vermont State Department of Education for certification for renewal of his contract to teach driver education for the ensuing year. No official statement was given by the School Board to explain the reasons why the plaintiff's contract was not renewed; nor was any opportunity afforded the plaintiff for a hearing to challenge the basis for the non-renewal.

The plaintiff understood that no contract for reemployment for the 1971–1972 school year would issue until he had received an equivalency certificate by the state department of education. The plaintiff had no legitimate claim to such a contract until he had achieved certification. However, at the time certification was accomplished, the School Board had decided against rehiring the plaintiff. There were several reasons why his contract was not signed on June 15. The principal cause was his issuance of driver education cards to students who had not completed the statutory requirements and his failure to respond to questions addressed to him by the superintendent concerning this subject. The plaintiff's intercession with Mr. Marcoux, his hostility toward the principal, his threatened and actual commencement of the litigation and his failure to achieve certification as of that time, were all contributing factors to the board's decision not to offer a contract for the ensuing school year.

After the termination of employment at Lamoille, the plaintiff obtained driver education employment in the public schools at Bethel and Bellows Falls, Vermont, during the 1971–1972 school year. In August 1972 he moved to Pasadena, Maryland, where he is presently engaged in teaching in the public school system.

## CONCLUSIONS OF LAW

The substance of the plaintiff's complaint is founded on two claims. First, he asserts that the defendants' failure to renew his teaching contract for the 1971–1972 school year was caused by his criticism of the Lamoille Union administrative officials and School Board and

---

3. 16 V.S.A. § 1752(b) provides:

A superintendent may suspend a teacher under contract on the grounds of incompetence, conduct unbecoming a teacher, failure to attend to duties or failure to carry out reasonable orders and directions of the superintendent and school board.

violated his rights to freedom of speech and expression protected by the First Amendment of the United States Constitution. Secondly, he maintains the defendants' failure to extend his teaching contract was accomplished without affording him a hearing and hence offends his constitutionally protected right to due process.

 Of course if the plaintiff's contract of public employment for the ensuing year was withheld in retaliation for the exercise of his right to free expression, there is valid ground for federal relief. Perry v. Sinderman, 408 U.S. 593, 596, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Stolberg v. Board of Trustees for the State Colleges of Connecticut, 474 F.2d 485 (2d Cir., Jan. 29, 1973). The statements of a public school teacher on matters of public concern are entitled to First Amendment protection, even though the expression is directed against his superiors. Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

> The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Pickering v. Board of Education, supra, 391 U.S. at 568, 88 S.Ct. at 1734.

The plaintiff, in teaching at Lamoille, was not called upon to surrender his right to freedom of belief and expression. He did, however, undertake obligations of candor and cooperation in answering inquiries made of him by his superior officials and the School Board, who were charged with the responsibility of determining his fitness to continue to serve as a teacher in the public school system. Beilan v. Board of Education, 357 U.S. 399, 405, 78 S.Ct. 1317, 2 L. Ed.2d 1414 (1958).

The subject matter of the controversy, which generated this action, was not a matter of serious public concern. The plaintiff had been engaged in a continuing disagreement with the school principal, and later the superintendent, over the manner, method and integrity of the driver education program, which was his principal responsibility as a teacher at Lamoille. He elected to present his side of the problem to an individual member of the School Board because the school principal, in seeking to verify his certification of students' time, had caused him embarrassment with his students and interfered with his teaching function. In this, the plaintiff was not voicing criticism of his superior on matters of great public concern. He was merely complaining of the attitude and conduct of his principal. The plaintiff's conference with the school director, Mr. Marcoux, inspired further interest and inquiry on the latter's part, which was not hostile to the plaintiff. The plaintiff sought answers to certain questions and Mr. Marcoux tried to obtain them.[4]

This meeting generated further inquiry by the full board with specific questions addressed to both the plaintiff and his principal. The principal answered; the plaintiff refused.

---

4. Q. Was there any action taken by the Board strictly and solely by reason of the charge that he made on harassment against MR. FORTUNE?
 A. No, there was not as a matter of fact, this is—
 MR. BURGESS: Objection, the rest is not responsive.
 THE COURT: Will you read me the question?
 (LAST QUESTION READ ALOUD BY THE REPORTER)
 A. I cannot formally and I can answer for myself, certainly, I not only did not take any action on account of it but I was there to guarantee that no action was taken because of the wordings of the charges of complaints of harassment and interference.
 Q. No action was taken against him or—
 A. Mr. Bowles, against Mr. Bowles.
 Q. Whose interest were you watching out for when you caused this investigation?
 A. My first and prime interest, was with Mr. Bowles.

There is no definitive rule to apply to a teacher's First Amendment rights in dealing with the school administration.

Because of the enormous variety of fact situations in which critical statements by teachers . . . may be thought by their superiors, against whom the statements are directed to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be adjudged. *Pickering,* supra, 391 U.S. at 569, 88 S.Ct. at 1735.

Unlike *Pickering,* however, here the plaintiff's complaint against his superiors in the educational chain of command was directed toward those with whom he would normally be in contact in the performance of his teaching duties. And there is present a serious problem of school discipline, since the plaintiff sought to assume full control of the driver education requirement in a manner contrary to the specific directions of his superior. Compare *Pickering,* supra, 391 U.S. at 570, 88 S.Ct. 1731.

■ That the school authorities have the right and duty to screen the officials, teachers and employees, as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. Beilan v. Board of Education, supra, 357 U.S. at 405, 78 S.Ct. 1317; Adler v. Board of Education, 342 U.S. 485, 493, 72 S.Ct. 380, 96 L.Ed. 517 (1952).

■ The expression upon which the plaintiff lays his complaint does not relate to a question of public controversy and debate. See Lefcourt v. The Legal Aid Society, 312 F.Supp. 1105, 1113 (S. D.N.Y.1970), aff'd 445 F.2d 1150, 1153 (2d Cir. 1971). Essentially this action concerns a problem of faculty discipline and control within the school. And the plaintiff has not established that the defendants' failure to grant the plaintiff a teaching contract for the 1971–1972 school year was "motivated by other than legitimate school concerns." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 526, 89 S.Ct. 733, 747, 21 L.Ed.2d 731 (1969) (Harlan, J., dissenting).

■■ There remains the plaintiff's further claim that the failure of the defendants to extend the plaintiff's teaching contract, without affording him a hearing, was a denial of due process. The question must turn on whether the plaintiff has established that the defendants, in failing to renew his teaching contract, have deprived him of a property interest. Board of Regents v. Roth, 408 U.S. 564, 575–578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

■ The education law of Vermont provides the procedure for a hearing upon the timely request of a teacher who has been suspended during the term of his contract. It makes no provision for an administrative hearing if his contract is not renewed. 16 V.S.A. § 1752. See In re Petition of Davenport, 129 Vt. 546, 283 A.2d 452 (1971). Yet apart from any statute to this effect, a teacher who has held a contract with a school district for a considerable time, may be entitled to the equivalent of tenure by custom and usage. And absent "sufficient cause" he may have a right to continued employment in the school system. While proof of such a property interest will not entitle him to reinstatement, it will obligate the school officials "to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency." Perry v. Sinderman, 408 U.S. 593, 602–603, 92 S.Ct. 2694, 2700, 33 L. Ed.2d 570 (1972).

Here the plaintiff's right to a renewal contract was conditioned upon his certification of eligibility by the state department of education. At the time decision against his retention was reached he was not entitled to a contract for renewal. At most, he had an expectancy of future employment, rather than a right. See Board of Regents v. Roth,

supra, 408 U.S. at 577–578, 92 S.Ct. 2701, 33 L.Ed.2d 548.

■■ The court is mindful that the plaintiff later achieved certification, but at that point in time he clearly understood the reason for his nonretention was his failure to respond to the legitimate inquiry of the School Board concerning his conduct of the driver education program. He made no request for a hearing before the Board. He had engaged counsel and instituted the present proceedings in this court two days after the School Board meeting on June 15, 1971. It is, of course, recognized that he was not required to exhaust his administrative remedies. See Damico v. California, 389 U.S. 416, 417, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); Eisen v. Eastman, 421 F.2d 560, 567 (2d Cir. 1969); Carpenter v. Harrison, Civ. No. 5919, D.C.Vt. (June 2, 1970). But having failed to request a hearing and electing to forego that procedure in favor of proceeding directly to this court under 42 U.S.C. § 1983, he is not in proper posture to claim a monetary award based on the denial of an administrative hearing.

In any event, the plaintiff has failed to demonstrate that the loss of such a hearing has worked to his financial detriment. The reasons given by the defendants at the trial for the nonrenewal of the plaintiff's contract make it clear that his release and nonretention were for improperly certifying his students' completion of the required driving time and for insubordinate conduct in refusing to answer a proper inquiry relating to the manner and method of performing his assigned duties.

The court holds the defendants' decision to withhold the plaintiff's teaching contract for the ensuing year was for sufficient cause and for reasons unrelated to the exercise of First Amendment rights. Judgment will be entered for the defendants without taxing costs against the plaintiff.